01
02
03
04
05
06
07                     UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF WASHINGTON
08                              AT SEATTLE

09  PETER J. MCDANIELS,              )
                                     )    CASE NO. C12-1289-TSZ-MAT
10          Plaintiff,               )
                                     )
11      v.                           )    REPORT AND RECOMMENDATION
                                     )
12  BILL ELFO, et al.,               )
                                     )
13          Defendants.              )
    _____ )
14

15                              INTRODUCTION

16          Plaintiff Peter J. McDaniels proceeds *pro se* and *in forma pauperis* in this 42 U.S.C. §

17  1983 civil rights case.   He is currently incarcerated at Stafford Creek Corrections Center, but

18  brings claims regarding religious practices, jail conditions and services, medical complaints,

19  and access to law issues associated with his prior confinement at Whatcom County Jail.   (*See*

20  Dkt. 142.)   This matter is now pending against twenty-eight individuals, sued in their personal

21  and official capacities, and Whatcom County.

22          The Court herein addresses a Motion for Summary Judgment Regarding Religious

REPORT AND RECOMMENDATION
PAGE -1

01  Practices filed by defendants Wendell Terry, Chief Corrections Deputy Wendy Jones,

02  Lieutenant Mark Raymond, Grievance Coordinator Greg DePaul, Food Service Manager Robin

03  Weiss, Sergeant Darrell Smith, Nurse Shari Holst, and Deputies Jonathan Bitner and Connie

04  George. (Dkt. 90.)   The Court also addresses plaintiff's Cross Motion for Summary Judgment

05  Regarding Religious Practices filed against those same individuals, as well as against Whatcom

06  County, Dr. Stuart Andrews, Sergeant Peter Klein, and Deputy Jess Barrios.   (Dkt. 141.)

07         Because defendants filed their motion prior to the inclusion of Whatcom County in this

08  matter, they do not address plaintiff's claims against that entity, or any official capacity claims

09  against the individual defendants.   *See Community House, Inc. v. City of Boise, Idaho*, 623

10  F.3d 945, 966-67 (9th Cir. 2010) (a claim against a government official in his official capacity

11  is treated as a claim against the entity itself) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66

12  (1985)).   Given the lack of complete briefing on this issue, the Court addresses only plaintiff's

13  claims for damages against the individual defendants in their personal capacities.   In this

14  respect, the Court notes plaintiff does not seek declaratory or injunctive relief in relation to his

15  religious practice claims.   (*See* Dkt. 5-1 at 12-18 and Dkts. 14 & 142.)[1]   Also, due to the

16  absence of adequate briefing on other claims, the Court addresses only claims brought pursuant

17  to the Free Exercise Clause of the First Amendment, under the Religious Land Use and

18  Institutionalized Persons Act (RLUIPA), and alleging unconstitutional punishment.[2]

19         Finally, the Court does not address whether or not plaintiff exhausted his administrative

20         1 Because plaintiff is no longer at the jail, any such claims would likely be deemed moot.
    *Preiser v. Newkirk*, 422 U.S. 395, 403 (1975); *Dilley v. Gunn*, 64 F.3d 1365, 1368-69 (9th Cir. 1995).

21
22         2 For example, any claims arising under the Equal Protection or Procedural Due Process
    Clauses of the Fourteenth Amendment are addressed only by plaintiff, and only then to a minimal
    extent.   (*See* Dkt. 141.)

REPORT AND RECOMMENDATION
PAGE -2

01  remedies as required by the Prison Litigation Reform Act (PLRA).   42 U.S.C. § 1997e(a) ("No

02  action shall be brought with respect to prison conditions under section 1983 of this title, or any

03  other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until

04  such administrative remedies as are available are exhausted."); *Jones v. Bock*, 549 U.S. 199,

05  211-12 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that

06  unexhausted claims cannot be brought in court.")   Exhaustion is an affirmative defense, and

07  defendants bear the burden of raising and proving the absence of exhaustion.   *See Jones*, 549

08  U.S. at 212-17, and *Wyatt v. Terhune*, 315 F.3d 1108, 1117-19 (9th Cir. 2003).   Defendants

09  include, at most, observations in declarations as to an absence of evidence of grievances or

10  written complaints.   (*See also* Dkt. 142 at 35 (plaintiff attests that defendants prevented him

11  from exhausting his claims).)   The Court reserves ruling on issues of exhaustion pending

12  receipt of briefing from the parties.

13      Now, having considered plaintiff's claims within the above-described parameters and

14  for the reasons described below, the Court recommends defendants' motion be GRANTED in

15  part and DENIED in part, and plaintiff's cross-motion be DENIED.

16                                    BACKGROUND

17      Plaintiff is Muslim and was incarcerated at Whatcom County Jail in both 2009 and

18  2011.   He alleges violations of his constitutional and statutory rights to practice his faith in a

19  variety of respects during his incarceration, and maintains all of the practices at issue are

20  fundamental and required tenets of his religion.

21  A.   Ramadan

22      Ramadan entails a month of fasting, from sunrise to sunset, and other religious

REPORT AND RECOMMENDATION
PAGE -3

01  obligations for Muslims.  In anticipation of plaintiff's 2011 Ramadan, Lieutenant Raymond

02  issued a memorandum setting forth the accommodations to be provided by Whatcom County

03  Jail.  (Dkt. 93, Ex. A.)   Plaintiff would begin his fast on the morning of August 1, 2011, with a

04  morning meal prior to sunrise, two meals would be provided "during the hours of darkness,

05  after sunset and prior to sun rise[,]" dried dates "may be provided" pending availability through

06  the jail's food service provider, Aramark, a concluding feast would not be provided, and

07  medical staff had been notified of "the Ramadan diet."   (*Id*.)

08      Plaintiff was not provided with a meal before sunrise on the first day of Ramadan, and

09  maintains the omission was intentional.  (Dkt. 142 at 1-3.)   He alleges his food was thereafter

10  repeatedly delivered one and a half or more hours after sunset throughout the month, that his

11  suggestion food be brought at the regular dinner hour was refused, and that the timing of the

12  evening meal delivery interfered with the breaking of his fast and prayers.  (*Id*. at 5.)   Plaintiff

13  also contends defendants tried to force him to break his fast prior to the conclusion of Ramadan

14  on August 30, 2011.  (*Id*. at 7.)

15      Defendants  maintain  Sergeant  Smith  unintentionally  erred  in  failing  to  provide

16  plaintiff's first pre-sunrise meal.  (Dkt. 90 at 2; Dkt. 92 at 3; and Dkt. 93 at 2-3.)   They deny

17  any other meal delivery error or that Ramadan was cut short.  (*See* Dkt. 92 at 2-4 and Dkt. 93 at

18  2-3.)  Defendants further deny any indication of significant delay in evening meal delivery,

19  while observing meals were to be delivered after sunset, rather than at a specific time.  (Dkt.

20  93, Ex. A; *see also* Dkt. 6 at 49.)   Chief Corrections Deputy Jones adds that early meal delivery

21  could have posed a health issue by leaving perishable food unrefrigerated.  (Dkt. 92 at 3.)

22      Plaintiff was not provided with dates for use in breaking his daily fasts in 2011.  (Dkt.

REPORT AND RECOMMENDATION
PAGE -4

01   139 at 4, 11 and Dkt. 142 at 3.)   Jones describes this change from plaintiff's 2009 Ramadan as

02   resulting from a standardization of religious-based diets between the periods of plaintiff's

03   incarceration.   (Dkt. 92 at 11.)   She concluded that supplying foods requested by offenders of

04   various faiths would result in over-spending the meal budget, and asserts that her research

05   revealed other foods available to plaintiff, or even water, could be used to break his fast.   (*Id.*;

06   *see also* Dkt. 137 at 5-6.)

07         Nor did the jail provide plaintiff with an Eid al-Fitr feast at the conclusion of Ramadan.

08   (Dkt. 142 at 7.)   Jones explains that a variety of religious feasts are not provided at the jail, and

09   distinguishes the meals provided for Thanksgiving and Christmas.   (Dkt. 92 at 11-12.)

10         Plaintiff also takes issue with the failure to provide him with Ensure drink supplements,

11   nutritionally adequate food, and pain reliever during Ramadan.   (Dkt. 142 at 3-5.)   While

12   provided two cans of Ensure each night in 2009, his request was denied in 2011.   (*Id.* at 3.)

13   He maintains he required the supplement given the insufficient nutrition in the diet provided,

14   and that defendants refused to provide pain reliever during the hours he could consume it

15   according to his religious beliefs.   (*Id.*)   Weiss, the Food Service Manager at the jail employed

16   through Aramark, and Jones attest to the nutritional adequacy of the Ramadan diet, and the

17   approximately 2,800 calories and ninety grams of protein provided in the meals.   (Dkt. 92 at 11

18   and Dkt. 95 at 1-2.)   Nurse Holst, after consultation with Dr. Andrews, denied the request for

19   Ensure as not medically necessary given that plaintiff's weight was within normal range.

20   (Dkt. 91 at 1-2 and Exs. A and B.)   Also, documents confirm the denial of plaintiff's requests

21   for pain reliever.   (*Id.*, Exs. A and B.)

22   / / /

REPORT AND RECOMMENDATION
PAGE -5

01  B.      Halal Meat

02          Whatcom County Jail does not provide inmates with Halal meat, which excludes certain

03  types of meat and includes only meat slaughtered in a specific manner.   (Dkt. 92 at 5 and Dkt.

04  137 at 12-15.)   Instead, pursuant to a policy adopted August 10, 2009, the jail provides a

05  vegetarian diet for offenders with religious restrictions, and vegan meals for offenders whose

06  faiths prohibit the consumption of all animal-based proteins.   (Dkt. 92 at 7.)

07          The jail adopted its religious diet policy in an effort to standardize the process for

08  observant offenders of different faiths, allowing for meal options that did not violate religious

09  prohibitions, could be quickly provided, met necessary nutritional standards, allowed the jail to

10  remain within its allocated budget resources and administrative capabilities, reduced the

11  probability of conflict, and avoided the need for specialized vendor contracts.   (*Id*. at 4-7.)

12  Aramark provides a meal option for both vegetarian and vegan meals that can be provided on a

13  few hours notice and can be substituted for standard meals at the same cost, while other

14  religious diets can be provided "at a price to be mutually agreed upon in advance."   (*Id*. at 7

15  and Ex. 2 at 5.)

16          Inmates can request a vegetarian or vegan meal during the booking process, in a

17  response to a question on a medical screening form, or at any time during their incarceration in

18  an inmate request form, or "kite."   (*Id*. at 7-8.)   Inmates can also choose to eat the standard

19  meal, which includes no pork products, and primarily poultry, coupled with textured vegetable

20  protein, to meet dietary protein requirements.   (*Id*. at 8.)

21          Plaintiff requested placement on a religious diet during his April 16, 2009 booking.

22  (*Id*. at 8.)   He submitted a "Health Request" form two days later, stating he had not yet been

REPORT AND RECOMMENDATION
PAGE -6

01  placed on the diet and could not eat the meat provided, adding:  "I am also poor.  Instead of

02  eating a Halaal/Kosher diet at home, I just became a vegetarian because the price of the

03  Halaal/Kosher meat is very high."  (*Id*., Ex. 3.)  He was told to submit a request and, Jones

04  attests, was placed on the vegetarian diet as of April 25, 2009.  (*Id*. at 8 and Ex. 3.)

05      In a September 21, 2009 kite, plaintiff requested he be "re-issue[d] either a vegetarian or

06  halal special tray now that Ramadan is over."  (Dkt. 137, Ex. A.)  However, in a letter to Jones

07  dated October 5, 2009, plaintiff stated that, as of October 17, 2009 ("six months after [his]

08  arrest"), the vegetarian meal would "no longer be acceptable[,]" and he required a "Halal diet,"

09  including Halal meat.  (*Id*., Ex. B.)  Jones denied plaintiff's request.  (Dkt. 92 at 8.)

10      Jones maintains that, upon his second incarceration in 2011, plaintiff initially requested

11  a no-pork diet, which was accommodated by the standard diet, but went on to repeatedly

12  request Halal meat.  (*Id*. at 9.)  She states that plaintiff was placed on a vegetarian diet on

13  October 20, 2011 and, at his request, was removed from that diet on October 28, 2011.  (*Id*.)

14  Plaintiff denies he requested removal from the vegetarian diet, contending he, instead,

15  requested a Halal diet.  (Dkt. 139 at 2.)

16      Plaintiff maintains Halal meat is inexpensive, while also conceding he could not afford

17  to purchase it when not in jail and was at "the mercy of others in the Muslim Community to

18  provide Halal meats."  (Dkt. 142 at 4 and Dkt. 127-6 at 2-3.)  Plaintiff also maintains Jones

19  refused to provide canned tuna or other fish as an alternative to Halal meat, and refused to

20  entertain the idea of Halal meat being provided by individuals outside the jail.  (Dkt. 126-6 at 5

21  and Dkt. 142 at 4-6; *see also* Dkt. 6 at 54 (September 30, 2011 kite proposing outside sources be

22  contacted).)  Jones avers an absence of any indication plaintiff requested canned tuna or other

REPORT AND RECOMMENDATION
PAGE -7

01  fish, and states a request that Halal meat be provided from individuals outside the jail would

02  have been denied for security purposes.   (Dkt. 137 at 4-5.)

03  C.      Arabic Qur'an

04        Plaintiff alleges he was deprived of an Arabic Qur'an for some nine months in 2011.

05  (Dkt. 142 at 9.)   He avers Terry failed to supply an Arabic Qur'an as requested, while

06  supplying "very expensive Protestant bibles[]" to other inmates.   (*Id*. at 9-10.)   Terry, who

07  serves as a volunteer minister at the jail, does not recall ever speaking with plaintiff or receiving

08  a request for a Qur'an, either in English or Arabic.   (Dkt. 94.)

09        Defendants assert that, while first providing plaintiff with an English Qur'an, they

10  subsequently obtained and provided plaintiff with an Arabic version.   (Dkt. 92 at 12.)

11  Plaintiff denies he ever received an Arabic Qur'an, stating the version provided was a

12  "3-column Roman Transliteration which [did] him absolutely no good[,]" that the Arabic script

13  was "a novelty[]" and the book "a phonetic attempt to help non-Arabic readers do their

14  prayers."   (Dkt. 141 at 6.)

15                                DISCUSSION

16        Summary judgment is appropriate when a "movant shows that there is no genuine

17  dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed.

18  R. Civ. P. 56(a).   The moving party is entitled to judgment as a matter of law when the

19  nonmoving party fails to make a sufficient showing on an essential element of his case with

20  respect to which he has the burden of proof.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

21  (1986).   The Court must draw all reasonable inferences in favor of the nonmoving party.

22  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

REPORT AND RECOMMENDATION
PAGE -8

01      The central issue is "whether the evidence presents a sufficient disagreement to require

02 submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

03 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).   The moving party bears the

04 initial burden of showing the district court "that there is an absence of evidence to support the

05 nonmoving party's case."   *Celotex Corp.*, 477 U.S. at 325.   The moving party can carry its

06 initial burden by producing affirmative evidence that negates an essential element of the

07 nonmovant's case, or by establishing that the nonmovant lacks the quantum of evidence needed

08 to satisfy its burden of persuasion at trial.   *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.,*

09 *Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000).   The burden then shifts to the nonmoving party to

10 establish a genuine issue of material fact.   *Matsushita Elec. Indus. Co.*, 475 U.S. at 585-87.

11      In supporting a factual position, a party must "cit[e] to particular parts of materials in

12 the record . . .; or show[] that the materials cited do not establish the absence or presence of a

13 genuine dispute, or that an adverse party cannot produce admissible evidence to support the

14 fact."   Fed. R. Civ. P. 56(c)(1).   The nonmoving party "must do more than simply show that

15 there is some metaphysical doubt as to the material facts."   *Matsushita Elec. Indus. Co.*, 475

16 U.S. at 585.   "[T]he requirement is that there be no *genuine* issue of material fact.   . . . Only

17 disputes over facts that might affect the outcome of the suit under the governing law will

18 properly preclude the entry of summary judgment."   *Anderson*, 477 U.S. at 247-48 (emphasis

19 in original).   "The mere existence of a scintilla of evidence in support of the non-moving

20 party's position is not sufficient[]" to defeat summary judgment.   *Triton Energy Corp. v.*

21 *Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).   Nor can the nonmoving party "defeat

22 summary judgment with allegations in the complaint, or with unsupported conjecture or

REPORT AND RECOMMENDATION
PAGE -9

01 conclusory statements." *Hernandez v. Spacelabs Med. Inc*., 343 F.3d 1107, 1112 (9th Cir.

02 2003).

03 A.      RLUIPA

04        RLUIPA provides in relevant part as follows:

05 No government shall impose a substantial burden on the religious exercise of a
   person residing in or confined to an institution, . . . unless the government
06 demonstrates that imposition of the burden on that person . . . (1) is in
   furtherance of a compelling governmental interest; and (2) is the least restrictive
07 means of furthering that compelling governmental interest.

08 42 U.S.C. § 2000cc-1(a).   The statute defines "religious exercise" as "any exercise of religion,

09 whether or not compelled by, or central to, a system of religious belief."   § 2000cc-5(7)(A).

10        A plaintiff bears the initial burden under RLUIPA of demonstrating a religious exercise

11 impinged upon by the government, and that the government's conduct imposed a substantial

12 burden on that religious exercise.   *Greene v. Solano County Jail*, 513 F.3d 982, 987 (9th Cir.

13 2008); *Warsoldier v. Woodford*, 418 F.3d 989, 994-95 (9th Cir. 2005).   If plaintiff succeeds in

14 that prima facie showing, the burden shifts to the government to establish that the challenged

15 practice furthers a compelling governmental interest and is the least restrictive means of

16 furthering that compelling interest.   § 2000cc-2(b); *Green*, 513 F.3d at 986.

17        "RLUIPA does not define 'substantial burden.'"   *San Jose Christian College v. City of*

18 *Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004).   However, the Ninth Circuit has explained

19 that a substantial burden on religious exercise "must be 'oppressive' to a 'significantly great'

20 extent[,]" imposing a "significantly great restriction or onus upon such exercise."   *Id.*   The

21 government "must place more than an inconvenience on religious exercise."   *Guru Nanak Sikh*

22 *Soc'y of Yuba City v. Cnty. of Sutter*, 456 F.3d 978, 988 (9th Cir. 2006) (internal quotation

REPORT AND RECOMMENDATION
PAGE -10

01  marks omitted).   In considering a prisoner's challenge to institutional policies, the Court

02  considers whether the government's conduct "'denies [an important benefit] because of

03  conduct mandated by religious belief, thereby putting substantial pressure on an adherent to

04  modify his behavior and to violate his beliefs.'"   *Hartmann v. Cal. Dep't of Corr. & Rehab.*,

05  707 F.3d 1114, 1124-25 (9th Cir. 2013) (quoting *Warsoldier*, 418 F.3d at 995 (alteration in

06  original)).

07         "'Context matters'" in the application of the compelling governmental interest standard

08  adopted in RLUIPA.   *Id.* at 1124 (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 722-23 (2005)).

09  That is, "[c]ourts are expected to apply RLUIPA's standard with 'due deference to the

10  experience and expertise of prison and jail administrators in establishing necessary regulations

11  and procedures to maintain good order, security and discipline, consistent with consideration of

12  costs and limited resources.'" *Id.* (quoting *Cutter*, 544 U.S. at 723).

13         1.    Arabic Qur'an:

14         The parties do not dispute that recitation from an Arabic Qur'an constitutes a religious

15  exercise for plaintiff, but disagree as to whether or not he was provided with such an item.

16  However, even assuming as true plaintiff's assertion that the Qur'ans provided by defendants

17  did not meet his religious requirements, he fails to set forth a RLUIPA violation.

18         Plaintiff challenges only the failure of defendants to provide him with this religious

19  item.   Yet, "directed at obstructions institutional arrangements place on religious observances,

20  RLUIPA does not require a State to pay for an inmate's devotional accessories."   *Cutter*, 544

21  U.S. at 720 n.8 (quoting 42 U.S.C. § 2000cc-1(a)(1)-(2) and citing *Charles v. Verhagen*, 348

22  F.3d 601, 605 (7th Cir. 2003) (overturning prohibition on possession of Islamic prayer oil but

REPORT AND RECOMMENDATION
PAGE -11

01 leaving inmate with responsibility for purchasing the oil)). *See also Florer v. Congregation*

02 *Pidyon Shevuyim, N.A.*, 639 F.3d 916, 925 (9th Cir. 2011) ("But the DOC is not under a

03 comparable duty to provide religious materials and services to inmates; rather, the DOC must

04 provide reasonable opportunities to exercise religious freedom.") (cited sources omitted).

05 Given the absence of any evidence, or even suggestion, that defendants prohibited or prevented

06 plaintiff from obtaining an Arabic Qur'an, this claim fails to set forth a RLUIPA violation, and

07 should be dismissed. *See, e.g., Low v. McGinness*, No. 2:10-cv-2398 JFM (PC), 2012 U.S.

08 Dist. LEXIS 20428 at *18 (E.D. Cal. Feb. 17, 2012) (recommending dismissal of RLUIPA and

09 First Amendment claim given absence of evidence plaintiff prevented from possessing Qur'an

10 or other devotional material), *adopted by* 2012 U.S. Dist. LEXIS 45583 (Mar. 30, 2012).

11       2.   <u>Ramadan</u>:

12      Plaintiff identifies a number of religious exercises impinged upon by defendants in

13 relation to Ramadan.   Specifically, plaintiff points to his need for meals to be timely consumed

14 before sunrise and at a certain time after sunset, dates to conclude his daily fasts, to maintain his

15 fast until the conclusion of Ramadan, and to conclude Ramadan with an Eid al-Fitr feast.[3]

16         a.   <u>Failure to provide meals</u>:

17      There is no dispute that the requirement to consume food only before sunrise and after

18 sunset during the month of Ramadan constitutes a religious exercise under RLUIPA.   Also,

19 defendants admittedly failed to provide plaintiff with a pre-sunrise meal on the first day of

20 Ramadan in 2011.   However, the parties disagree as to whether that failure was an error or

21 _____

22      3 Plaintiff's claim as to Halal meat extends beyond Ramadan and is discussed below.   Also, and as requested by plaintiff (Dkt. 141 at 4), the Court addresses his allegations regarding the failure to provide adequate nutrition and pain reliever in relation to the Fourteenth and Eighth Amendments.

REPORT AND RECOMMENDATION
PAGE -12

01  intentional, and whether it imposed a substantial burden.  The parties further disagree as to

02  whether or not defendants failed to provide plaintiff with meals at the conclusion of Ramadan.

03          Plaintiff's contention that defendants intentionally failed to deliver his first pre-sunrise

04  meal lacks support in the record.  (*See*, *e.g.*, Dkt. 6 at 24, 35, 49 (documents reflecting plaintiff

05  was to be provided a pre-sunrise meal beginning on August 1, 2011, and apologizing for the

06  failure to provide that meal).)   Moreover, in his declaration as to "Islamic Authority," plaintiff

07  concedes that, while "preferable," the morning meal "is not a condition for the correctness of

08  the fast (i.e. if you wake up late and don't eat, it does not nullify the fast)[,]" and that his belief

09  to the contrary, as asserted in his complaint, has now been "corrected[.]"   (Dkt. 127-7 at 19.)

10  In other words, the omission of this first meal, whether intentional or not, did not prevent

11  plaintiff from proceeding with his fast.

12          Plaintiff also claims defendants attempted to end Ramadan early.[4]   Defendants deny

13  this allegation, pointing to the response to an August 29, 2011 kite in which plaintiff was told

14  that, consistent with his request, the fast would end on August 30, 2011.  (Dkt. 92 at 13.)

15  However, defendants do not address other kites submitted by plaintiff, including another

16  August 29, 2011 kite reflecting his report that he had not received breakfast.  (Dkt. 6 at 51.)

17  Yet, whatever meal omissions occurred at the conclusion of Ramadan, plaintiff concedes he

18          4 Plaintiff's latest description of this claim is difficult to understand:  "I was only given one

19  very small sack lunch to last from 10 PM on the 28th until 10 PM on the 29th.   Then again, I was only
    given dinner, a small sack, so I had no food for breakfast the next day (the 30th) nor did I get lunch or

20  dinner the next day." (Dkt. 142 at 7.)   His prior descriptions of this claim, and other documents, appear
    to reflect that he did not receive one or both meals on a single day.  (Dkt. 2 at 36-38 (alleging he

21  received an evening meal on August 28, 2011, but was not provided breakfast or dinner on August 29,
    2011); Dkt. 14 at 10 (alleging he was refused food on the "last night of the fast and the previous
    morning, so other than a couple of cookies, I had nothing to eat for over twenty-four hours."); Dkt. 6 at

22  51 (August 29, 2011 kite:   "I was not given any breakfast this morning."); and Dkt. 141 at 24 (stating he
    was denied food for both the first meal and "once again on the last day of Ramadan as well."))

REPORT AND RECOMMENDATION
PAGE -13

01 was not forced to break his fast because he had saved "emergency back up food[.]"   (Dkt. 2 at

02 36-37; *accord* Dkt. 14 at 10.)

03         The Court does not doubt that the failures in relation to meal delivery made plaintiff's

04 ability to fast on the days in question more difficult.   However, plaintiff fails to support the

05 contention that such failures were more than isolated incidents or an inconvenience, and,

06 instead, imposed a significantly great restriction on his religious practice or substantial pressure

07 to modify his behavior and violate his beliefs.   *See, e.g.*, *Boyd v. Lehman*, C05-0020-JLR, 2006

08 U.S. Dist. LEXIS 94222 at *31 (W.D. Wash. Mar. 20, 2006) (failure to provide evening meal

09 after sunset for first three days of Ramadan did not impose a substantial burden), *adopted by*

10 2006 U.S. Dist. LEXIS 94223 (May 19, 2006); *Maynard v. Hale*, No. 3:11-CV-1233, 2012 U.S.

11 Dist. LEXIS 114136 at *15-16 (M.D. Tenn. Aug. 14, 2012) (finding no substantial burden due

12 to one day of missed meals during Ramadan where plaintiff made no showing he suffered poor

13 health or was unable to practice his religion).   Indeed, in neither instance can it be said that

14 plaintiff was compelled to break his fast or otherwise modify his religious practice.

15 Defendants are, therefore, entitled to dismissal of these claims on summary judgment.

16                 b.    Late delivery of evening meals:

17         Plaintiff alleges his evening meals were not brought "at the correct time or anywhere

18 near the correct time to be meaningful[,]" and were brought "one and one half hours or more

19 late most every night." (Dkt. 142 at 5.)   He maintains this rendered him unable to break his fast

20 at or near the time required, and forced him to miss his "sunset prayer" each night.   (*Id.*)

21         Defendants deny any evidence of significant delay in the delivery of plaintiff's evening

22 meals, and suggest the absence of any evidence plaintiff complained to that effect.   They

REPORT AND RECOMMENDATION
PAGE -14

01 further state that plaintiff was, as planned, properly provided with meals "during the hours of

02 darkness, after sunset."   (Dkt. 93, Ex. A.)   Pointing to plaintiff's statement that Muslims break

03 their fast "[e]ach night after sunset," defendants note that this phrase does not state "at sunset or

04 as the sun sets."   (Dkt. 136 at 2.)

05          In a kite dated August 1, 2011, plaintiff requested delivery of his evening meal

06 "sometime between now (i.e. 6:55 pm) and 8:40 PM tonight."   (Dkt. 6 at 40.)   Plaintiff's

07 "requests for meal service to be delivered at a specific time" was "denied[.]"   (*Id.* at 49.)

08 Raymond responded: "[Y]our accommodation is for meals to be delivered during the hours of

09 darkness only.   If you want to eat the items at a later time you can save the food items to eat, as

10 you feel fit."   (*Id.*)   Plaintiff did, therefore, raise an issue as to the delivery of his meals.

11 However, while finding the quality of the argument supplied by defendants on the issue

12 underwhelming at best, the Court nonetheless finds an absence of support for plaintiff's

13 contention of a RLUIPA violation.

14          Plaintiff avers he required his evening meals "around 8 PM[.]"   (*See*, *e.g.*, Dkt. 141 at

15 11.)   However, records reflect that, at the time, plaintiff twice informed defendants he was

16 required to end his fast at some point after 8:45 p.m.   (Dkt. 6 at 32 (August 10, 2011 grievance

17 stating that on "a normal day during Ramadan" his "meal would be eaten right after sunset

18 which is currently 8:45-8:50ish PM.") and 42 (August 1, 2011 kite indicating he could not

19 consume pain relievers until "after 8:45 at night).)   Plaintiff submits that his meals were

20 brought "closer to 10 PM[.]"   (Dkt. 141 at 11.)   (*See also* Dkt. 127-11 at 3 (plaintiff's former

21 cellmate, Asher Becker, states plaintiff was not "given his meals until almost 10 pm or

22 later[]").)   The question, therefore, is whether the delivery of evening meals some one hour

REPORT AND RECOMMENDATION
PAGE -15

01   and fifteen minutes after sunset imposed a substantial burden on plaintiff's religious exercise.

02   There is an absence of support for plaintiff's contention that the delay in the delivery of

03   his evening meals resulted in his inability to break his fast at or near the time required, and

04   prevented him from reciting his prayers.   Notably, in his declaration regarding Islamic

05   Authority, plaintiff does not discuss a need to consume a full meal at the time he breaks his fast,

06   at any specific time, or at some specific time in relation to his prayers.   (*See* Dkt. 127-7.)

07   Plaintiff, rather, discusses in detail his need to break his fast by eating dates and recites portions

08   of the Qur'an as requiring that the "sunset prayer" not be said until the fast has been broken.

09   (*Id*. at 8-13.)   Another document submitted by plaintiff states:

10   *It is customary to break one's fast as soon as the sun has set with a light snack*
     (often with one or three dates, according to the Prophet's custom). . . . The
11   breaking of the fast is called *iftar*.   It is followed by Maghrib (sunset prayer),
     *which may be followed at one's convenience by a full dinner*.   It is suggested
12   not to overeat in order to compensate for the period of fasting.   This is a good
     time to drink plenty of water or other fluid, which the body needs.

13

14   (Dkt. 127-12 at 52 (emphasis added).)   (*See also id*. at 22-23 (other documents reflect no more

15   than that daily fasts are broken with a prayer and "*iftar*" meal after sunset, and quote the Qur'an

16   as stating:   "One may eat and drink at any time during the night 'until you can plainly

17   distinguish a white thread from a black thread by the daylight[.]"))   Nor does plaintiff dispute,

18   as Raymond had suggested, that he could have saved items of food to eat at the breaking of his

19   fast.   (Dkt. 6 at 49.)

20   As with the omission of meals, the delivery of plaintiff's evening meals some one hour

21   and fifteen minutes after plaintiff was allowed to eat according to the tenets of his religion can

22   be understood to have made his fasts more difficult to endure.   However, at most, plaintiff

REPORT AND RECOMMENDATION
PAGE -16

01  contends his religious practice required he break his fast at a certain time and with a certain food

02  item.    His inability to consume a full meal at or immediately after sunset does not demonstrate

03  defendants imposed a significant onus or substantial pressure on plaintiff to modify his

04  behavior and violate his beliefs.   Nor was the delay so extreme it could be reasonably

05  construed as serving to compel plaintiff to abandon his religious principles.   Defendants are, as

06  such, also entitled to summary judgment in relation to this claim.[5]

07              c.     Dates:

08          It is undisputed that plaintiff was not provided with dates to end his daily fasts in 2011.

09  Plaintiff maintains eating dates is an obligatory tenet of the Ramadan fast.  (Dkt. 142 at 3.)

10  He asserts dates are "readily available in Bellingham, and they are a dried good, so it is easy to

11  obtain them through the mail via the Internet.   (*Id.*)   Jones attests that dates were not provided

12  in 2011 as a result of the standardization of religious-based diets between the two periods of

13  plaintiff's incarceration, and asserts other foods available to plaintiff, or even water, could be

14  used to break his fast.  (Dkt. 92 at 11; Dkt. 137 at 5-6.)  (*See also* Dkt. 95 at 8 (Weiss declares

15  that the provision of dates required departure from the standard menu and would result in

16  increased supply and administrative costs for the jail).)   Plaintiff cites to numerous provisions

17  of the Qur'an as mandating the use of dates to break fasts (Dkt. 127-7 at 8-13), and states that

18  any reference to the use of water "is a mercy from Allah[,]" and "meant for people who are

19  either lost in the wilderness or captives of war." (Dkt. 139 at 4, 11.)

20          Plaintiff provides support for his contention that his religious practice requires the use

21  _____

22          5 Because plaintiff fails to demonstrate a substantial burden, the Court need not address his
        contention that meals could have been brought to him at the regular dinner hour.  *See Greene*, 513 F.3d
        at 987.

REPORT AND RECOMMENDATION
PAGE -17

01  of dates to end his fasts, and the Court declines to address defendants' contention that he may

02  satisfy this practice in some other respect.   *See Thomas v. Review Bd. of Indiana Employment*

03  *Security Sec. Division*, 450 U.S. 707, 714 (1981) (noting, in relation to free exercise claims, that

04  "[c]ourts are not arbiters of scriptural interpretation.")   Therefore, the failure of defendants to

05  provide plaintiff with dates may be fairly said to have impacted the practice of his religion.

06  However, the Court nonetheless finds no RLUIPA violation in relation to dates.

07          Each of the several complaints plaintiff submitted to the Court set forth his claim as

08  challenging defendants' failure to provide him with dates.   (*See* Dkts. 2, 14 & 142.)   Plaintiff

09  further submits several kites and grievances confirming that he requested dates be provided and

10  complained about the failure to satisfy those requests.   (*See*, *e.g.*, Dkt. 6 at 25, 26, 31, 36).)

11  Plaintiff concedes the provision of dates "would have caused the jail to actively make an effort

12  to obtain the accommodation."   (Dkt. 141 at 2.)   He states:   "Everything else except the

13  dates, is something that they already had.   They just refused to assist with me practicing my

14  religion."   (*Id.*)   However, as stated above, RLUIPA does not require that a government "pay

15  for an inmate's devotional accessories."   *Cutter*, 544 U.S. at 720 n.8.   Therefore, the jail's

16  failure to provide plaintiff with dates cannot be considered as imposing a substantial burden on

17  his ability to practice his religion.

18          Plaintiff now contends, in his response to defendants' motion for summary judgment

19  and cross motion, that defendants "essentially 'banned' and 'prohibited'" dates by refusing to

20  respond to his request for assistance in acquiring them from the Islamic community.   (Dkt. 141

21  at 2-3.)   He avers he "asked" for help in getting dates from the Islamic community and "started

22  pursuing other means of obtaining them" after August 11, 2011, and defendants "refused to

REPORT AND RECOMMENDATION
PAGE -18

01  even consider the idea (i.e. I got no responses from them[;] [t]hey prohibited them because

02  when I told them I would pay for them myself, they refused to respond to my requests.)"   (*Id.* at

03  3.)   He further states he "had no way to contact" his Mosque "because they were in the middle

04  of renovating a new building" and he "did not have the address[,]" that he could not get through

05  to certain individuals "because their electronic phone system is incompatible with the jail's[,]"

06  and that, because he did not have any envelopes for several days during Ramadan, it was "too

07  late" by the time he eventually sent a letter.   (*Id.*)

08        The Court finds significant the absence of any documentation showing plaintiff asked

09  for assistance in obtaining dates from another source, particularly in light of the many kites and

10  grievances provided in this action.   (*See*, *e.g.*, Dkt. 6 (attaching 333 pages of exhibits).)   Also,

11  plaintiff's arguments reflect that his inability to obtain dates from an outside source resulted

12  from factors unrelated to defendants, such as an absence of adequate contact information.

13        Given the above, the Court finds plaintiff's contention that defendants "essentially"

14  banned or prohibited him from obtaining dates to be self-serving and of questionable veracity,

15  and, therefore, insufficient to set forth a genuine issue of material fact.   *F.T.C. v. Publ'g*

16  *Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving

17  affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine

18  issue of material fact.").   For this reason, and for the reason stated above, defendants should be

19  granted summary judgment in relation to this claim.

20              d.    Concluding feast:

21        Plaintiff avers that the Eid al-Fitr feast is an obligatory tenet of Ramadan.   (Dkt. 142 at

22  7.)   He maintains special feasts are provided to inmates celebrating Christmas and Easter, and

REPORT AND RECOMMENDATION
PAGE -19

01  that defendants "stopped [him] from fulfilling this simple obligation." (*Id*.)  Defendants

02  counter that they do not provide feasts for Eid al-Fitr, or various other religious holidays,

03  including, for example, Easter,[6] Passover, Gurpurb, or Diwali. (Dkt. 92 at 11-12.)  Jones

04  distinguishes meals provided for Thanksgiving and Christmas, stating that the former is a

05  secular holiday and that both meals involve the same foods served on typical days, and are

06  provided at lunch at the request of Aramark, in order to allow the food service workers to leave

07  early. (*Id*. at 12.)  She contends the provision of an Eid Al-Fitr feast to plaintiff would have

08  opened defendants "to charges of discrimination against the other faiths represented in the jail

09  population." (*Id*.)

10      It would appear that, in stating the above, defendants maintain that the failure to provide

11  plaintiff with an Eid al-Fitr feast furthers a compelling governmental interest; that is, the need

12  to maintain a consistent policy in regard to religious holiday feasts.   However, the Court need

13  not address the sufficiency of this argument given plaintiff's failure to demonstrate the

14  imposition of a substantial burden on his religious practice.

15      Plaintiff avers he "needed only a small snack lunch to replace one of the regular hot

16  meals[,]" and that he "should have been able to at least get a sack lunch to eat in my room by

17  myself for my holiday." (Dkt. 142 at 7.)  At the same time, in his declaration of Islamic

18  Authority, plaintiff states the feast "need not be a full scale meal, but merely something should

19  be eaten after the prayer which is the forenoon – approximately 9 to 10 AM." (Dkt. 127-7 at

20  _____

21      6 There is a discrepancy between defendants' motion and the affidavit from Smith as to
    whether or not a special meal is provided on Easter.   However, the language in the motion appears to be
    merely responsive to plaintiff's allegation, and otherwise relies on the declaration from Jones, who

22  specifies that an Easter meal is not provided, while meals are provided on Thanksgiving and Christmas.
    (*See* Dkt. 90 at 2-3 and Dkt. 92 at 11-12.)

REPORT AND RECOMMENDATION
PAGE -20

01  14.)  Yet, there is no indication plaintiff was denied the opportunity to eat something at the

02  time and in the location in question, or was in some other respect compelled to abandon his

03  religious obligations.   While he may have preferred to eat a full lunch in his cell at that time,

04  his religious obligations, as he describes them, did not require that he do so.   As such,

05  plaintiff's claims as related to an Eid al-Fitr feast should be dismissed.

06          3.   <u>Halal Meat</u>:

07          Plaintiff alleges defendants imposed a substantial burden on his religious exercise

08  through the failure to provide him with Halal meat.   *See Shakur v. Schriro*, 514 F.3d 878, 882

09  n.2 (9th Cir. 2008) ("Halal meat is ritually slaughtered and prepared according to Islamic

10  specifications. Muslims are instructed to eat meat only if it is Halal. Meat that is not Halal is

11  referred to as Haram and is forbidden.")   Plaintiff maintains he is required to eat Halal meat as

12  a component of his religious exercise.   (Dkt. 127-7.)   Defendants point to evidence that

13  plaintiff admittedly could not afford Halal meat when he was free of incarceration (*see*, *e.g.*,

14  Dkt. 92, Ex. 3, Dkt. 142 at 4, and Dkt. 127-6 at 2-3), as supporting the conclusion that "meat

15  cannot be considered a necessary practice, or to have that significant of an impact on his

16  sincerely held religious beliefs."   (Dkt. 90 at 8.)

17          "RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a

18  prisoner's religion," but "does not preclude inquiry into the sincerity of a prisoner's professed

19  religiosity."   *Cutter*, 544 U.S. at 725 n.13 (citing *Gillette v. United States*, 401 U.S. 437, 457

20  (1971) ("'The "truth" of a belief is not open to question'; rather, the question is whether the

21  objector's beliefs are 'truly held.'") (quoted source omitted)).   Documents submitted by the

22  parties arguably raise a question as to the sincerity of plaintiff's belief that he was required to

REPORT AND RECOMMENDATION
PAGE -21

01   eat Halal meat.   In particular, an April 18, 2009 kite from plaintiff in which he requested a

02   vegetarian diet states:   "Instead of eating a Halaal/Kosher diet at home, I just became a

03   vegetarian because the price of the Halaal/Kosher meat is very high."   (Dkt. 92 at 26.)   (*See*

04   *also* Dkt. 137, Ex. A (September 21, 2009 kite asking "the kitchen to re-issue either a

05   vegetarian or halal special tray now that Ramadan is over."))   However, the fact that plaintiff

06   could not afford Halal meat does not preclude the sincerity of his belief his religion required its

07   consumption.   *Cf. Shakur*, 514 F.3d at 858 (stating, in relation to free exercise claim, that the

08   district court should have focused on whether the plaintiff "sincerely believes eating kosher

09   meat is consistent with his faith.")

10          Defendants also suggest that, if plaintiff did not consume Halal meat as a regular part of

11   his diet outside of his incarceration, it is difficult to reconcile this fact with his contention that

12   the diet provided to him in jail put substantial pressure on him to modify his behavior and

13   violate his religious beliefs.   However, plaintiff denies he was a vegetarian when not

14   incarcerated, maintaining he consumed Halal meat donated by his religious community,

15   purchased Kosher meat when he could afford it, and frequently ate fish.   (Dkt. 141 at 14-15

16   and Dkt. 142 at 9.)[7]   Other documents suggest plaintiff anticipated his consumption of a

17   vegetarian diet would be only temporary.   (Dkt. 137, Ex. B.)

18          7 Plaintiff states he "reluctantly agreed" to a vegetarian diet at booking in 2009, upon being told
19   he would not be getting a Halal diet.   (Dkt. 141 at 14-15.)   He believed he would only be in jail for a
     few days, "so the vegetarian diet would not have been a big deal."   (*Id*. at 15.)   Plaintiff further
     explains that, while "living on the 'streets[]'" prior to his incarceration in 2009, he was "forced into
20   making 'culinary choices' that often meant eating a lot of frozen fish and beans."   (*Id*. at 15.)   He adds:
     "It's not that I couldn't afford Halal Meat, it was just that the grocery stores would not make special
21   orders of 'specialty meats' for someone using the Washington 'EBT' food stamp program."   (*Id*.)   The
     Islamic Community thereafter "came to the rescue."   (*Id*.)   Plaintiff avers:   "I have never been a
22   vegetarian in any way shape or form by my own will and desire.   Even then, I was still provided with
     halal meats, and I ate a whole lot of fish."   (*Id*.)

REPORT AND RECOMMENDATION
PAGE -22

01          On the other hand, it is noteworthy that plaintiff maintains he requested canned tuna or

02   other fish as an alternative, stating that, while eating Halal meat is a fundamental tenet of his

03   religion, "all fish is Halal[,]" and need not be "'specially slaughtered.'"   (Dkt. 127-7 at 7-8.)

04   He contends Jones denied his suggestion, despite the fact that "[t]una is a product that they

05   already have in stock."   (Dkt. 141 at 5.)   Jones denies plaintiff requested fish as an alternative

06   to Halal meat, and further notes plaintiff's admission that he did receive fish on the vegetarian

07   diet.   (Dkt. 137 at 3.)

08          Plaintiff, in fact, states that the vegetarian diet included fish "at least once a week,"

09   while maintaining "it wasn't really fish[,] [i]t was mostly breading with a thin-fishy-paste in the

10   center about as thick as a finger nail."   (Dkt. 127-6 at 3.)   While plaintiff apparently found the

11   quality of the fish unsatisfactory, the fact that he concedes fish is "Halal," that he frequently ate

12   fish when not incarcerated, and that he apparently received fish as a regular part of his diet

13   while incarcerated, raises a question as to whether it can be reasonably said that defendants

14   imposed a significant onus on his religious practice, or put substantial pressure on plaintiff to

15   modify his behavior and violate his beliefs.   Indeed, while stating canned tuna or other fish

16   would have sufficed as a temporary solution, plaintiff also observes that the availability of

17   Halal meat was "irrelevant" given that the jail stocked canned tuna.   (Dkt. 141 at 5, 38.)

18          Arguably, the above reflects the existence of issues of fact precluding a finding of

19   summary judgment for either party on the question of whether the diet provided to plaintiff

20   substantially burdened his religious practice.   Nor does the Court, at this time, otherwise find

21   summary judgment in relation to this claim appropriate.

22          Effective August 10, 2009, the jail instituted a policy of providing either a vegetarian or

REPORT AND RECOMMENDATION
PAGE -23

01  ovo-lacto vegetarian diet to all offenders following "religious diets[.]"  (Dkt. 6 at 55.)  This

02  policy was enacted in an effort to standardize the process for observant offenders of different

03  faiths.  (Dkt. 92 at 9; Dkt. 137 at 4.)  It allowed for meal options that did not violate any

04  religious prohibitions, meals that could be provided quickly, met necessary nutritional

05  standards, budget resources, and administrative capabilities, allowed for order and avoided

06  conflict, and avoided specialized vendor contracts.  (Dkt. 92 at 4-10; Dkt. 137 at 2-5.)

07      Jones attests she considered the dietary restrictions of various faiths in adopting the

08  religious diet policy.  (Dkt. 92 at 4-6.)  She states that, with the exception of a branch of

09  Orthodox Christianity, all of the faiths she considered allowed for the consumption of a

10  vegetarian or vegan diet.  (*Id*.)

11      Jones further attests she considered but rejected the possibility of developing

12  specialized meals fitting the requirements of various religions as "an administrative

13  nightmare."  (*Id*. at 6.)  This would have, for example, required that Aramark develop a

14  number of different menus by faith and variants of faiths.  (*Id*.)  Other considerations included

15  the fact that the jail serves three meals a day to a large and rapidly fluctuating population, and is

16  limited to the use of a jail kitchen and cold, freezer, and dry storage areas designed for a

17  capacity of less than half of the average daily population.  (*Id*. at 9-10 (the jail has a combined

18  average daily population of 375 offenders, with 7,767 offenders booked in 2009 and 7,900

19  offenders in 2011; average length of stay for an offender is twenty days, but some fifty-two

20  percent and some forty-seven percent of offenders were released within seventy-two hours in

21  2009 and 2011 respectively, and slightly over eighty percent of offenders were released within

22  thirty days; the jail kitchen was originally designed for a capacity of 148 inmates).)

01          Jones contrasts the jail's short-term population, with, for example, the State prison

02   system's "stable and long term offender population[,]" stating that "[a] stable population allows

03   the prisons time for diet creation, menu planning, bulk purchasing, and controlled preparation

04   to prevent the cross contact of foodstuffs from different religions."   (*Id*. at 9.)   Weiss

05   maintains that the food service staff at the jail do "not have the background or expertise to

06   prepare, store and handle Halal meat[,]" and the absence of any practical way to guarantee no

07   cross-contamination.   (Dkt. 95 at 2-3.)

08          Jones attests that she considered the impact to the jail's budget, which included meal

09   costs of approximately $615,000 and $576,000 in 2009 and 2011 respectively.   (Dkt. 92 at 7,

10   10.)   She reflects consideration of the jail's existing contract with Aramark and the possibility

11   of additional, specialized vendor contracts.   (*Id*. at 4, 7.)   Aramark had an already developed

12   meal option for vegetarians and ovo-lacto vegetarians that could be substituted on a few hours

13   notice at the same per meal costs, while meals for other religious diets could be provided "at a

14   price to be mutually agreed in advance."   (*Id*. at 7 (citing *id*., Ex. 2 at 5).)   Jones contends the

15   creation of a meal plan accommodating all religious requirements and restrictions would have

16   "decimate[d]" the meal budget and not have allowed for the "control of food costs in any

17   meaningful way."   (*Id*.)

18          Jones also sets forth concerns as to security, including the objective of providing meals

19   with equal appeal to the standard menu so as to reduce conflicts between offenders.   (Dkt. 92 at

20   4.)   She rejects the viability of allowing the Islamic Community to provide Halal meat due to

21   the significant "opportunity for the introduction of contraband[.]"   (*Id*. at 4-5.)   She further

22   asserts that, if the jail were to provide plaintiff with a separate, faith-based diet, with foods of

REPORT AND RECOMMENDATION
PAGE -25

01   his choosing, the jail would be expected to provide the same for other inmates, resulting in

02   "significant financial burden" and "organizational chaos in the kitchen."   (Dkt. 137 at 4.)

03        Defendants bear the burden under RLUIPA of demonstrating their religious diet policy

04   furthers a compelling governmental interest and is the least restrictive means of furthering that

05   compelling interest.   42 U.S.C. § 2000cc-2(b); *Green*, 513 F.3d at 986.   Defendants here

06   identify compelling governmental interests as a general matter, including cost containment,

07   practical and administrative considerations and burdens, and issues of security and order.   *See*,

08   *e.g.*, *Hartmann*, 707 F.3d at 1124-25 (acknowledging need for "regulations and procedures to

09   maintain good order, security and discipline, consistent with consideration of costs and limited

10   resources."); *Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993) (finding, with respect to free

11   exercise claim by Jewish inmate, that a "prison has a legitimate interest in running a simplified

12   food service, rather than one that gives rise to many administrative difficulties."); *Baranowski*

13   *v. Hart*, 486 F.3d 112, 125-26 (5th Cir. 2007) (holding that, where kosher meals were not

14   provided to a Jewish inmate, policy "related to maintaining good order and controlling costs"

15   involved compelling governmental interests).   They also maintain the religious diet policy

16   adopted is the least restrictive means of furthering those interests.   However, defendants fail to

17   provide sufficient information or argument demonstrating satisfaction of their burden.

18        A correctional facility must produce "competent evidence" to support the existence of a

19   compelling governmental interest.   *Shakur*, 514 F.3d at 889-90.   Conclusory affidavits do not

20   suffice.   *See id*.   Nor may the facility rely on a mere assertion that a practice is the least

21   restrictive means.   *Id*. at 890.   The facility "'cannot meet its burden to prove least restrictive

22   means unless it demonstrates that it has actually considered and rejected the efficacy of less

REPORT AND RECOMMENDATION
PAGE -26

01   restrictive measures before adopting the challenged practice.'" *Id*. (quoting *Warsoldier*, 418

02   F.3d at 996).

03         In this case, defendants maintain alternatives to their existing religious diet policy

04   would be cost prohibitive.   However, while identifying total food costs, defendants provide no

05   competent evidence – and, in fact, no information whatsoever – as to the costs of alternative

06   measures, and, therefore, the potential impact on their budget.   For example, neither Jones, nor

07   Weiss attests to the costs of "[o]ther religious meals" provided by Aramark under the existing

08   contract.  (Dkt. 92 at 18.)   The contract reflects that such meals would be provided "at a price

09   to be mutually agreed in advance."   (*Id*.)   There is no indication whether or not Jones inquired

10   into pricing, and no indication from either Jones or Weiss, the latter of whom is directly

11   employed by Aramark, as to what that pricing might be.   Rather, the assertions of both Jones

12   and Weiss as to cost are conclusory.

13         Defendants also focus on either the alternative of providing meals for all practitioners of

14   different faiths and variants of those faiths, or the alternative of making a single exception for

15   plaintiff.   There is no indication whether they considered any other alternatives, such as, for

16   example, providing kosher meals as an additional religious diet option, thereby satisfying the

17   requirements of both Jewish and Islamic offenders.   (*See* Dkt. 92 at 4-6.)   Also, while pointing

18   to the variety of diet restrictions in different religions, there is an absence of information as to

19   the populations actually served by the jail.   At most, defendants observe that, in both 2009 and

20   2011, "plaintiff was the only inmate practicing Islam and seeking meal accommodation to do

21   so[.]"  (Dkt. 90 at 9.)   While it may be true that "one inmate simply does not justify the cost

22   and administrative burden[]" of procuring Halal meat, the existence of only one such inmate

01  also implicates defendants' contentions as to the degree of the burdens alleged, and their

02  assertion that they adopted the least restrictive means to further their interests.

03      In addition, while pointing to practical and administrative burdens posed by the

04  alternatives considered, defendants appear to focus exclusively on the alternative of preparing

05  Halal meat and other religious meals within their facility.   Yet, the Aramark contract identifies

06  the availability of "prepackaged [religious] meals[.]"  (Dkt. 92 at 18.)  Defendants do not

07  address the availability or impacts of utilizing such an alternative.  Nor, given the absence of

08  any information or discussion as to the alternatives available through Aramark, is it clear

09  whether defendants reasonably point to the possible need for additional vendor contracts.

10      Finally, while the Court does not intend for any inference as to merit, it notes one

11  additional argument raised by plaintiff. [8]   In response to defendants' assertions as to the

12  fluctuating and short-term population served at the jail, plaintiff points to King County and

13  Pierce County Jails, and the receiving units in Shelton, as handling significantly larger number

14  of inmates in the same "high turnover rate atmosphere[.]"   (Dkt. 141 at 39.)   Plaintiff provides

15  no information as to what religious meal options those facilities provide, but it is worthwhile to

16  note the Ninth Circuit's observation that it has "'found comparisons between institutions

17  analytically useful when considering whether the government is employing the least restrictive

18  means[,]'" and that "'the failure of a defendant to explain why another institution with the same

19  compelling interests was able to accommodate the same religious practices may constitute a

20      8 Although declining to address each of the many different arguments raised by plaintiff, the
    Court observes that his "Budget Analysis for Whatcom County Jail & Profit Surplus" is, at best,
21  speculative, and in large part irrelevant to the questions before the Court.  (Dkt. 127-8 (construing the
    budget numbers provided as reflecting a surplus, positing that defendants make a substantial profit from
22  commissary and other inmate purchases, and alleging defendants engaged in an "indigent kit scam" as a
    "tax write-off").)

REPORT AND RECOMMENDATION
PAGE -28

01  failure to establish that the defendant was using the least restrictive means.'"  *Shakur*, 514 F.3d

02  at 890-91 (quoting *Warsoldier*, 418 F.3d at 1000).

03       For the reasons set forth above, the Court concludes that defendants fail to meet their

04  burden of demonstrating their religious diet policy furthers a compelling governmental interest

05  and is the least restrictive means of furthering that compelling interest.  *See, e.g., id.* at 890

06  (finding no competent evidence as to the additional cost of providing Halal or kosher meat to

07  Muslim prisoners where defendants provided only conclusory affidavit that did not

08  affirmatively show personal knowledge of specific facts); *McDaniels v. Fischer*, No.

09  C10-823-MJP-JPD, 2011 U.S. Dist. LEXIS 79588 at *38-39 (W.D. Wash. June 17, 2011)

10  (defendants failed to offer any evidence supporting their assertion that the cost of providing

11  inmate with a no-peanut Halal diet "would be so cost prohibitive as to constitute a compelling

12  government interest."), *adopted by* 2011 U.S. Dist. LEXIS 79591 (Jul. 21, 2011); *Thompson v.*

13  *Williams*, No. C06-5476-FDB-KLS, 2007 U.S. Dist. LEXIS 102081 at *40-50, 55-56 (W.D.

14  Wash. Sept. 18, 2007) (finding defendants failed to satisfy burdens on free exercise and

15  RLUIPA claims by showing with any specificity the "ways or amounts" the provision of Halal

16  meat diets would "create additional costs, decrease efficiency of the food preparation, and

17  necessitate hiring additional staff members," or to show that they actually explored other

18  alternatives), *adopted by* 2007 U.S. Dist. LEXIS 80487 (Oct. 31, 2007), and *aff'd* 2009 U.S.

19  App. LEXIS 6158 (9th Cir. 2009); *Shilling v. Crawford*, 536 F. Supp. 2d 1227, 1233-34 (D.

20  Nev. 2008) (defendants failed to address whether they considered alternatives to transfer

21  policy, such as providing pre-packaged or frozen kosher meals, or to submit "any concrete

22  evidence of the costs of alternatives they may have considered.").  Given the lack of necessary

REPORT AND RECOMMENDATION
PAGE -29

01 information and argument on these issues, neither party is entitled to summary judgment.

02 B.    <u>First Amendment</u>

03        The First Amendment guarantees the right to the free exercise of religion.   However,

04 the free exercise right "is necessarily limited by the fact of incarceration, and may be curtailed

05 in order to achieve legitimate correctional goals or to maintain prison security."   *O'Lone v.*

06 *Shabazz*, 482 U.S. 342, 348 (1987).[9]

07        To establish a free exercise claim, an inmate "must show the [defendants] burdened the

08 practice of [his] religion, by preventing him from engaging in conduct mandated by his faith,

09 without any justification reasonably related to legitimate penological interests."   *Freeman v.*

10 *Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled in part as stated below by Shakur*, 514

11 F.3d at 884-85.   The Ninth Circuit has clarified that it examines free-exercise claims according

12 to the "sincerity" test rather than according to the "centrality test."   *Shakur*, 514 F.3d at 885.

13 Therefore, a prisoner's religious concern implicates the Free Exercise Clause if it is (1)

14 "sincerely held" and (2) "rooted in religious belief," rather than in secular, philosophical

15 concerns.   *Id.* (citing *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994)).

16        "[I]ndirect coercion or penalties on the free exercise of religion, not just outright

17 prohibitions, are subject to scrutiny under the First Amendment."   *Lyng v. Northwest Indian*

18 *Cemetery Protective Ass'n*, 485 U.S. 439, 450-51 (1988).   However, "[t]his does not and

19 cannot imply that incidental effects of government programs, which may make it more difficult

20 to practice certain religions but which have no tendency to coerce individuals into acting

21 ─────────────────

22        9 The Court applies the same standards for pretrial detainees and prisoners in considering First Amendment claims.  *Pierce v. County of Orange*, 526 F.3d 1190, 1209 (9th Cir. 2008); *Valdez v. Rosenbaum*, 302 F.3d 1039, 1047-49 (9th Cir. 2002).

REPORT AND RECOMMENDATION
PAGE -30

01  contrary to their religious beliefs, require government to bring forward a compelling

02  justification for its otherwise lawful actions." *Id*.   As under RLUIPA, a free exercise

03  violation occurs where a burden imposes more than an inconvenience on religious exercise.

04  *See Guru Nanak Sikh Soc'y*, 456 F.3d at 988 (relying on the Supreme Court's free exercise

05  jurisprudence in defining a substantial burden under RLUIPA); *Warsoldier*, 418 F.3d at 995-96

06  (same).

07       The impingement of an inmate's constitutional rights is valid if reasonably related to

08  legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89 (1987).   The Court

09  balances the four factors set forth in *Turner* in making a determination:   (1) whether there is a

10  valid, rational connection between the prison regulation and the legitimate governmental

11  interest put forward to justify it; (2) whether alternative means of exercising the right on which

12  the regulation impinges remains open to prison inmates; (3) whether accommodation of the

13  asserted constitutional right will impact guards, other inmates, and the allocation of prison

14  resources; and (4) whether there is an absence of ready alternatives, versus the presence of

15  obvious, easy alternatives.  *Id.* at 89-91.

16       The court "must accord substantial deference to the professional judgment of prison

17  administrators, who bear a significant responsibility for defining the legitimate goals of a

18  corrections system and for determining the most appropriate means to accomplish them."

19  *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).   The burden is not on the state to prove the

20  validity of a challenged regulation, but is instead on the inmate to disprove it.  *Id.*

21       1.    Qur'an and Ramadan:

22       For the same reasons discussed above, the Court concludes that plaintiff fails to set forth

REPORT AND RECOMMENDATION
PAGE -31

01   a free exercise claim in relation to the provision of a Qur'an or his 2011 Ramadan.  That is,

02   defendants were not required to provide plaintiff with an Arabic Qur'an or dates to be used in

03   his devotional practice, and, given the absence of any showing defendants prevented him from

04   obtaining such items, his free exercise claims fail.  *See*, *e.g.*, *Florer*, 639 F.3d at 925; *Low*,

05   2012 U.S. Dist. LEXIS 20428 at *18.  Likewise, in failing to show defendants' actions in

06   relation to the provision of meals or a feast prevented plaintiff from complying with or

07   engaging in his sincerely held religious beliefs and/or requirements, plaintiff fails to

08   demonstrate defendants impinged upon his constitutional rights.  *See*, *e.g.*, *Maynard*, 2012

09   U.S. Dist. LEXIS 114136 at *11-12 ("short-term and sporadic disruption of . . . Ramadan eating

10   habits" did not demonstrate a free exercise violation); *Sandeford v. Plummer*, No. C06-06794

11   SBA (PR), 2010 U.S. Dist. LEXIS 35044 at *27-28 (N.D. Cal. Mar. 31, 2010) ("A mistaken

12   denial of two meals does not rise to the level of a constitutional violation.").  Defendants

13   should, therefore, be granted summary judgment on these claims.

14         2.   <u>Halal Meat</u>:

15         As stated above, while the Court has no reason to question the sincerity of plaintiff's

16   belief that he is required by his religion to consume Halal meat as a part of his diet, material

17   issues of fact may nonetheless preclude resolution of whether the diet offered to plaintiff did, in

18   fact, impose a substantial burden on his religious practice.  The Court is likewise unable to

19   resolve whether or not the jail's religious diet policy withstands scrutiny under *Turner*.

20         As opposed to the "much stricter burden" set forth in RLUIPA, *Turner* sets forth a

21   "deferential rational basis standard" for review of the government's burden.  *Greene*, 513 F.3d

22   at 986.  However, as with a RLUIPA claim, prison officials' bare assertions regarding burdens

**REPORT AND RECOMMENDATION**
**PAGE -32**

01  imposed by religious accommodations are insufficient; the officials must tender evidence

02  allowing the Court to analyze each of the factors set forth in *Turner*.

03        In this case, the Court concludes that the absence of sufficient information and

04  conclusory assertions offered by defendants in support of their religious diet policy preclude

05  resolution as to the merits of plaintiff's free exercise claim.   *See*, *e.g.*, *Shakur*, 514 F.3d at

06  886-87 (finding affidavit setting forth cost of accommodation conclusory, noting absence of

07  evidence suggesting officials "actually looked into" the request to provide kosher meals to

08  Muslim prisoners, "investigated suppliers of Halal meat, solicited bids or price quotes, or in any

09  way studied the effect that accommodation would have on operating expenses[,]" and "no

10  indication that other Muslim prisoners would demand kosher meals if Shakur's request were

11  granted[,]" and, therefore, insufficient findings in relation to third *Turner* factor); *Ward*, 1 F.3d

12  at 879-79 (finding insufficient findings in regard to third and fourth *Turner* factors; noting court

13  "cannot simply accept the warden's assertion" that providing a special meal for one prisoner

14  would significantly disrupt "efficient operation of culinary services[,]" and must make specific

15  findings as to both financial impact of such accommodation, and whether reasonable

16  alternatives to adopted policy exist); *McDaniels*, 2011 U.S. Dist. LEXIS 79588 at *48

17  (defendants failed to provide more than "bare assertions regarding the burdens of a proposed

18  accommodation" of no-peanut Halal diet, including evidence showing the accommodation

19  "actually imposed either budgetary or administrative burdens").   The Court should, therefore,

20  deny summary judgment in relation to this claim.

21  C.    Punishment Claims

22        Plaintiff maintains defendants' actions and omissions as described above amounted to

REPORT AND RECOMMENDATION
PAGE -33

01    punishment in violation of his constitutional rights.  (Dkt. 142 at 1-10, 22.)  He also avers

02    unconstitutional punishment through the failure to provide him with Ensure drink supplements

03    or an otherwise nutritionally adequate Ramadan diet, and the failure to provide him with pain

04    reliever to consume in his cell after sunset during Ramadan.   (*Id*.)

05        As defendants observe, because plaintiff was a pretrial detainee at the time of the events

06    in question, the Fourteenth Amendment applies.  *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)

07    ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of

08    guilt in accordance with due process of law.")   However, courts apply the Eighth Amendment

09    standard to determine if a violation of a pretrial detainee's Fourteenth Amendment right has

10    occurred.  *Simmons v. Navajo County Ariz.*, 609 F. 3d 1011, 1017-18 (9th Cir. 2010) (cited

11    source omitted).

12        A viable Eighth Amendment claim has an objective and subjective component.

13    *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  To satisfy the objective component, the

14    offending conduct "must be objectively, 'sufficiently serious[;] a prison official's act or

15    omission must result in the denial of 'the minimal civilized measure of life's necessities'[.]"

16    *Id*. (quoted sources omitted).   The subjective component requires that a prison official have a

17    "'sufficiently culpable state of mind[,]'" acting with "'deliberate indifference'" to an inmate's

18    health or safety.   *Id*. (quoted source omitted).   The prison official will be liable only if "the

19    official knows of and disregards an excessive risk to inmate health and safety; the official must

20    both be aware of facts from which the inference could be drawn that a substantial risk of serious

21    harm exists, and [the official] must also draw the inference."   *Id.* at 837.

22        The actions and omissions challenged in relation to an Arabic Qur'an, and the provision

REPORT AND RECOMMENDATION
PAGE -34

01  of meals, dates, a feast, and Halal meat cannot be reasonably construed as objectively,

02  sufficiently serious, amounting to denial of "'the minimal civilized measure of life's

03  necessities[,]'" or demonstrating that that jail officials knew of and disregarded an "excessive

04  risk" to plaintiff's health and safety.  *Id.* at 834, 837; *Hudson v. McMillian*, 503 U.S. 1, 8-9

05  (1992) ("Because routine discomfort is 'part of the penalty that criminal offenders pay for their

06  offenses against society,' 'only those deprivations denying 'the minimal civilized measure of

07  life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation.")

08  (internal citations and quoted sources omitted).  *See also LeMaire v. Maass*, 12 F.3d 1444,

09  1456 (9th Cir. 1993) ("The Eighth Amendment requires only that prisoners receive food that is

10  adequate to maintain health; it need not be tasty or aesthetically pleasing.") and *Foster v.*

11  *Runnels*, 554 F.3d 807, 811-14 & n.2 (9th Cir. 2009) (contrasting a claim that an inmate missed

12  sixteen meals in twenty three days, and lost some thirteen pounds, which constituted a

13  "sustained deprivation of food" and, therefore, sufficiently serious deprivation of life's basic

14  necessities, with a claim he was denied meals on two other dates:  "These relatively isolated

15  occurrences do not appear to rise to the level of a constitutional violation."))  These claims

16  should be dismissed.

17          Plaintiff also avers he "got extremely sick[]" when denied Ensure drink supplements in

18  2011 given the nutrition lacking in the Ramadan diet, causing him to suffer "physically and

19  spiritually," and leaving him "lethargic and sickly[.]"  (Dkt. 142 at 3.)  He challenges

20  defendants' refusal to provide him with pain reliever for use during the hours he could consume

21  it according to his religious beliefs, adding that inmates with funds were allowed to have pain

22  reliever during those hours.  (*Id.* at 5.)  He states that, as a result, he experienced "debilitating

REPORT AND RECOMMENDATION
PAGE -35

01 headaches[]" during Ramadan in both 2009 and 2011, "was in a lot of pain most of the month,"

02 and "couldn't sleep because of the pain among other reasons." (*Id*.)

03       Defendants' briefing on the above consists of the observation that plaintiff was not

04 given Ensure because it was not deemed medically necessary, the assertion that "[n]one of the

05 conditions or accommodations this Plaintiff alleges he was subjected to were used or

06 implemented in an effort to punish this inmate[,]" and the argument that Weiss should be

07 dismissed from this suit because "the vegetarian meal is nutritionally sufficient." (Dkt. 90 at 3,

08 12-13.) They do not mention plaintiff's allegation regarding pain reliever.

09       Defendants do provide relevant information in attached declarations. Holst attests and

10 provides evidence supporting the fact that plaintiff's request for drink supplements was denied

11 as "not medically necessary" given that his weight "was within a normal range." (Dkt. 91 at

12 1-2 and Ex. A at 1.) An attached August 9, 2011 kite reflects plaintiff's report that he was

13 "feeling sick" due to the inconsistent and nutritionally deficient Ramadan sacks provided, and

14 was told there was "nothing that medical can do about what the kitchen serves[]" and that he

15 was "not underweight[.]" (*Id*., Ex. A at 2.)

16       Jones and Weiss attest that the meals provided to plaintiff, during Ramadan and

17 otherwise, contained a total of 2,800 calories and 90 grams of protein. (Dkt. 92 at 11; Dkt. 95

18 at 2.) Weiss attaches a document from Aramark attesting to the caloric content of the

19 Ramadan diet and a standard Aramark Ramadan menu, while explaining that the meat items

20 reflected on that menu "were replaced with peanut butter as a protein substitute." (Dkt. 95 at 2

21 and Ex. A.)

22       Also, while Holst does not discuss the issue in her declaration, she attaches a kite and

REPORT AND RECOMMENDATION
PAGE -36

01   progress note touching upon the issue of pain reliever.   In the August 16, 2011 kite, plaintiff

02   requests a medical referral, stating it was his third request for "Tylenol at night" because he is

03   "getting headaches again[]" and has been "miserable for a couple of weeks now[.]"   (Dkt. 91,

04   Ex. A at 2.)   The kite response reflects that plaintiff previously complained about headaches

05   stemming from lights being left on all night, states that medical "had no control over" that, and

06   recommends plaintiff "stop all commissary food items[]" and "try drinking more water," as

07   "[d]ehydration can cause headaches."   (*Id*.)   The progress notes reflect that, earlier in July and

08   August, plaintiff complained about the light being kept on in his cell and was seen in the clinic

09   for headaches.   (*Id*., Ex. B.)

10          The Court has concerns about the allegations raised by plaintiff.   For example, the

11   Eighth Amendment "requires only that prisoners receive food that is adequate to maintain

12   health."   *LeMaire*, 12 F.3d at 1456.   Plaintiff, while maintaining the provision of nutritionally

13   inadequate food, does not dispute that his weight did not differ between 2009, when he was

14   provided with drink supplements, and 2011, when his request for drink supplements was

15   denied.   (Dkt. 141 at 52; *see also* Dkt. 127-9 at 1 ("Plaintiff's weight was not the issue.   It was

16   malnutrition."))   Also, his arguments raise a concern that his diet-related complaints reflect his

17   preferences, rather than setting forth a viable claim of food inadequate to maintain health.

18   (*See*, *e.g.*, Dkt. 139 at 8 (plaintiff complains the "gross inadequate 'high-sugar' diet they were

19   forcing [him] to eat" made him "very sick.") and Dkt. 127-6 at 3 ("[The meals] were mostly

20   sugar foods.   Plain white bread, cookies, cake, and peeled-dehydrated-potatoes were the

21   common fare for regular and vegetarian meals both."))   Nor is it at all apparent plaintiff could

22   support a contention that defendants acted with deliberate indifference in relation to his

REPORT AND RECOMMENDATION
PAGE -37

01   nutritional needs.   In addition, documents provided by plaintiff raise questions as to whether

02   defendants can be said to bear the responsibility, or to have acted with deliberate indifference in

03   relation to plaintiff's pain-relief issues.   (*See*, *e.g.*, Dkt. 127-12 at 13-14 (one 2009 kite reflects

04   plaintiff was told he could purchase Tylenol for use in his cell and that blood testing had

05   revealed normal results, and another 2009 kite shows that plaintiff had run out of Tylenol he

06   had purchased for his headaches, was told on-going Tylenol was not provided, and was advised

07   to "push fluids" during the time he was allowed to eat to help alleviate his headaches).)

08         However, it remains that defendants fail to meet their initial burden on summary

09   judgment of demonstrating an absence of evidence to support plaintiff's claims as to the

10   nutrition he received and as to his ability to consume pain reliever during Ramadan.   *Nissan*

11   *Fire & Marine Ins. Co., Ltd.*, 210 F.3d at 1102.   Indeed, as described above, defendants

12   provide no more than a modicum of argument or information in relation to these claims, and,

13   instead, rely almost entirely on their conclusory assertions.[10]

14         Plaintiff, on the other hand, does provide argument and evidence in relation to these

15   claims beyond the allegations set forth in his Second Amended Complaint.   He provides an

16   affidavit from Becker, his former cellmate, attesting to the nutritional deficiencies of the meals

17   provided at the jail, both generally and during Ramadan.   (Dkt. 127-10.)   He denies that the

18   meals he was provided were consistent with that reflected on the standard Aramark Ramadan

19   menu, or contained 2,800 calories.   (*See*, *e.g.*, Dkt. 127-9 and Dkt. 139.)   He provides a

20

21         10 Defendants do address plaintiff's claims as to nutrition and pain relievers generally in the
   factual section of their pending Motion for Summary Judgment re:   Conditions of Confinement &
22   Medical Claims.   (Dkt. 157 at 7, 9.)   However, that motion is not ripe for consideration.   Nor can it be
   said to provide adequate argument or evidence related to the precise claims at issue herein.

REPORT AND RECOMMENDATION
PAGE -38

01   document dated January 30, 2010 and entitled "Nutritional Analysis of Whatcom County Jail

02   Menus" that includes detailed information as to the meals provided by the jail, and information

03   relevant to plaintiff's claim, such as the observation that the special diet menus provided by the

04   jail "seem to be a little lower in calories that [sic] what the ARAMARK nutrition requirement

05   [sic] state."   (Dkt. 6-1 at 94-96 (describing the calorie differential as 2,700 calories versus

06   2,416 or 2,646 calories).)   He also provides a diary containing detailed descriptions of meals

07   received in 2011.   (Dkt. 6-2 at 24-44.)

08          However, as with defendants, the Court finds no basis for granting plaintiff summary

09   judgment in relation to the Ramadan-related nutrition and pain relief claims.   In addition to the

10   concerns raised above, it remains unclear, at this time, whether any material factual disputes

11   exist.   The Court should, as such, deny summary judgment in relation to these claims.

12   D.     <u>Wendell Terry</u>

13          Defendants argue Terry, a volunteer chaplain at the jail, should be dismissed from this

14   matter as he is not a "state actor" amenable to suit under 42 U.S.C. § 1983, and because he had

15   no involvement with any of the allegations at issue in this action.   The Court declines to

16   address whether or not Terry could be considered a state actor under § 1983.   *See*, *e.g.*, *Florer*,

17   639 F.3d at 919, 924-27 (noting that the Supreme Court has identified at least seven approaches

18   to the question of whether a private party has acted under color of state law, and concluding that

19   plaintiff failed to demonstrate, under two such approaches, that private entities operating as

20   contract chaplains within the Washington State prison system were state actors).   Nonetheless,

21   the Court agrees with defendants that plaintiff's claims against Terry should be dismissed.

22          Plaintiff appears to name Terry as a personal participant in the failure to timely provide

REPORT AND RECOMMENDATION
PAGE -39

01   him with his Ramadan evening meals, a concluding feast, dates, Halal meat, or an Arabic

02   Qur'an.   (Dkt. 142 at 1-10.)   He also alleges Terry is liable in that he conspired with and failed

03   to prevent other defendants from violating his constitutional rights in relation to the first and

04   concluding Ramadan meals, and adequate nutrition throughout Ramadan.   (*Id*.)   He does not

05   elsewhere name Terry in his Second Amended Complaint.   (Dkt. 142.)   Terry attests he is one

06   of several volunteer chaplains at the jail.   (Dkt. 94 at 1.)   He denies having any input or control

07   over jail administration, function, or policy, and does not recall ever speaking with plaintiff.

08   (*Id*. at 1-3.)

09          A plaintiff in a § 1983 action must allege facts showing how individually named

10   defendants caused or personally participated in causing the harm alleged in the complaint.

11   *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981).   Supervisory personnel may not be held

12   liable for actions of subordinates under a theory of vicarious liability.   *Taylor v. List*, 880 F.2d

13   1040, 1045 (9th Cir. 1989).

14          In order to establish liability for a conspiracy, a plaintiff in a § 1983 case "must

15   'demonstrate the existence of an agreement or meeting of the minds' to violate constitutional

16   rights."   *Crowe v. County of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010) (quoted source

17   omitted).   While they "'need not know the exact details of the plan, . . . each participant must at

18   least share the common objective of the conspiracy.'"   *Id*. (quoting *United Steelworkers of Am.*

19   *v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir. 1989) (en banc)).

20          Plaintiff's claims can be reasonably read as alleging, at most, facts supporting Terry's

21   involvement in the denial of a Qur'an and, possibly, dates.   (*See* Dkts. 141 & 142.)   However,

22   as stated above, those claims lack merit and should be dismissed.   Further, plaintiff fails to set

REPORT AND RECOMMENDATION
PAGE -40

01 forth any factual basis for Terry's involvement, either personally or as part of a conspiracy, in

02 the claims withstanding defendants' motion for summary judgment.   Plaintiff's contentions to

03 the contrary are no more than unsupported conjecture and conclusory, and may not, therefore,

04 serve to defeat summary judgment.   *Hernandez*, 343 F.3d at 1112.   For these reasons,

05 plaintiff's claims against Terry should be dismissed.

06 E.    Personal Involvement of Other Individual Defendants

07       Defendants assert that Raymond, DePaul, Bitner, George, Weiss, and Holst had no

08 decision-making authority regarding plaintiff's diet, whether or not he was given dates, Halal

09 meat, Ensure supplements, or even as to the timing of meals.   Defendants concede Smith erred

10 in failing to deliver one meal, but contend that error was a mistake, corrected quickly, and never

11 repeated.   They point to Jones as having made the decisions regarding Halal meat, dates, and as

12 to the religious diets.

13       As discussed above, the Court concludes that the only religious practice claims

14 surviving defendants' motion for summary judgment include those related to Halal meat, the

15 nutritional adequacy of plaintiff's 2011 Ramadan diet, and the denial of pain reliever during

16 Ramadan.   Because plaintiff alleges facts associating Jones, Weiss, and Holst with one or more

17 of those claims, defendants fail to support dismissal based on an absence of personal

18 participation.   However, having reviewed plaintiff's Second Amended Complaint, briefing in

19 relation to the current motion, and the remainder of the record, the Court concludes that plaintiff

20 sets forth no factual basis supporting the participation, either personally or as part of a

21 conspiracy, of defendants Raymond, DePaul, Bitner, George, and Smith in relation to such

22

REPORT AND RECOMMENDATION
PAGE -41

01   claims.[11]   Plaintiff's religious practices claims against these defendants should, accordingly,

02   be dismissed.   *See generally Arnold*, 637 F.2d at 1355, and *Crowe*, 608 F.3d at 440.

03   F.      Qualified Immunity

04         The individual defendants assert their entitlement to qualified immunity in relation to

05   plaintiff's Halal meat claim, arguing it is well established inmates of the Muslim faith do not

06   have a constitutional right to Halal meat.   (Dkt. 90 at 15-16 (citing cases).)   Defendants also

07   assert that plaintiff's claims against Weiss should be dismissed both because "the vegetarian

08   meal is nutritionally sufficient[]" (*id*. at 13) and because, as a private individual performing a

09   public job, she is similarly entitled to qualified immunity, *see Filarsky v. Delia*, ___ U.S. ___,

10   132 S.Ct. 1657, ___ (2012) ("[I]mmunity under § 1983 should not vary depending on whether

11   an individual working for the government does so as a full-time employee, or on some other

12   basis.").

13         As stated above, the Court lacks sufficient information to address plaintiff's claim as to

14   the nutritional adequacy of the Ramadan diet.   Neither defendants' bare assertion that the

15   vegetarian meal is nutritionally adequate, nor the declaration from Weiss stating as such

16   provides a sufficient basis upon which to decide whether Weiss or any other defendants are

17   entitled to qualified immunity.   The Court, therefore, addresses only the qualified immunity

18   argument raised in relation to plaintiff's Halal meat claim.

19         Under the doctrine of qualified immunity, state officials "performing discretionary

20

21         11 DePaul, in his position as Grievance Coordinator, can be said to have been involved in the
    processing of related grievances.   (*See, e.g.*, Dkt. 6 at 33, 76-80.)   However, plaintiff sets forth no basis
22   for DePaul's involvement in the issues underlying those grievances, namely, whether or not plaintiff
    was to be provided with Halal meat, drink supplements, or pain relievers.

REPORT AND RECOMMENDATION
PAGE -42

01   functions [are protected] from liability for civil damages insofar as their conduct does not

02   violate clearly established statutory or constitutional rights of which a reasonable person would

03   have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   In determining whether

04   qualified immunity applies, the Court considers whether the plaintiff alleged sufficient facts to

05   make out a violation of a constitutional right, and whether the constitutional right was clearly

06   established at the time of the alleged violation.   *Saucier v. Katz*, 533 U.S. 194, 201 (2001),

07   *modified by Pearson v. Callahan*, 555 U.S. 223 (2009) (explaining "that, while the sequence set

08   forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory").

09          "'If the right was not clearly established at the time of the violation, the official is

10   entitled to qualified immunity.'"   *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th

11   Cir. 2011) (quoted and cited sources omitted)).   In considering whether a right is clearly

12   established, "[t]he contours of the right must be sufficiently clear that a reasonable official

13   would understand that what [the official] is doing violates that right."   *Anderson v. Creighton*,

14   483 U.S. 635, 640 (1987).   The court applies an objective standard; "the defendant's subjective

15   understanding of the constitutionality of his or her conduct is irrelevant."   *Clairmont*, 632 F.3d

16   at 1109 (internal quotation marks and quoted source omitted).   An official who makes a

17   reasonable mistake as to what the law requires is entitled to immunity.   *See Saucier*, 533 U.S.

18   at 295; *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006).

19          In this case, plaintiff alleges a violation of his constitutional rights through the failure to

20   provide him with Halal meat, and, possibly, with canned tuna or other fish as a substitute for

21   Halal meat.   Considered as such, the Court finds defendants entitled to qualified immunity.

22          "Inmates . . . have the right to be provided with food sufficient to sustain them in good

REPORT AND RECOMMENDATION
PAGE -43

01   health that satisfies the dietary laws of their religion."  *McElyea v. Babbitt*, 833 F.2d 196, 198

02   (9th Cir. 1987).   However, it remains true that, as previously found by this Court, "the majority

03   of circuit and district courts that have looked at this specific issue have concluded there is no

04   such clearly established right to Halal meals, with or without Halal meat, under the First

05   Amendment's Free Exercise of Religion Clause, RLUIPA or the Equal Protection Clause of the

06   Fourteenth Amendment."   *Thompson*, 2007 U.S. Dist. LEXIS 102081 at *63, *adopted by* 2007

07   U.S. Dist. Lexis 80487, and *aff'd by* 2009 U.S. App. LEXIS 6158 at *2-3 ("The district court

08   also properly concluded that the defendants are entitled to qualified immunity because it was

09   not clearly-established at the time of the violation that the defendants were required to provide

10   him with either Halal or Kosher meals with meat in lieu of an ovo-lacto diet.").[12]  *Accord*

11   *Williams v. Morton*, 343 F.3d 212, 217-21 (3d Cir. 2003) (upholding denial of Halal meat meals

12   and provision of vegetarian diets to Muslim inmates under Free Exercise Clause); *Bilal v.*

13   *Lehman*, No. C04-2507-JLR, 2006 U.S. Dist. LEXIS 89430 at *18-20 (W.D. Wash. Dec. 8,

14   2006) (no clearly established right to a Halal meat diet); *Ellis v. United States*, No. 08-160 Erie,

15   2011 U.S. Dist. LEXIS 86927 at * 26-27 (W.D. Pa. Jun. 17, 2011) (same), *adopted by* 2011

16   U.S. Dist. LEXIS 83833 (Aug. 1, 2011); *Green v. Tudor*, 685 F. Supp. 2d 678, 702 (W.D. Mich.

17

18   _____

19          12 The Ninth Circuit's decision in *Shakur* is not to the contrary.  In that case, the Court
       addressed a prison's refusal to provide a kosher diet to a Muslim inmate who alleged the vegetarian diet
       he was provided caused gastrointestinal disturbance, thereby interfering with his religious practice.
20   *Shakur*, 514 F.3d at 885.  The Court found those facts demonstrated implication of the Free Exercise
       Clause and that adverse health effects from a prison diet can be relevant to the RLUIPA substantial
21   burden inquiry, but remanded for development of the factual record.  *Id.* at 885, 888-91.  The Court did
       not address Halal meat, or some other formulation of a Halal or other religious diet, separate and apart
22   from adverse health effects.   Nor did the Court address qualified immunity.

REPORT AND RECOMMENDATION
PAGE -44

01  2009) (same).[13]

02       Given the lack of clearly established law, a reasonable prison official would not have

03  been on notice that the provision of a vegetarian or ovo-lacto vegetarian diet to a Muslim

04  prisoner, in lieu of Halal meat or some other formulation of a Halal diet, would have violated

05  plaintiff's rights.   Accordingly, the individual defendants should be found immune from

06  liability in this case, and their motion for summary judgment granted in this respect.

07  G.       Damages under RLUIPA:

08       Although not raised by defendants, the Court also finds it prudent to address the

09  availability, or lack thereof, of damages against defendants in their personal capacities under

10  RLUIPA.   The United States Supreme Court has not resolved the issue, and the Ninth Circuit

11  has expressly reserved a ruling.   *Florer*, 639 F.3d at 922 n.3.   However, five circuit courts and

12  numerous district courts, including the Western District of Washington, have held that RLUIPA

13  does not authorize suits for damages against government officials in their personal capacities.

14  *See Stewart v. Beach*, 701 F.3d 1322, 1334 (10th Cir. 2012); *Rendelman v. Rouse*, 569 F.3d

15

16       13   Cases addressing varying factual patterns reflect similar conclusions.   *See*, *e.g.*,
    *Muhammad v. Sapp*, No. 09-14943, 2010 U.S. App. LEXIS 15175 at *9-10, 15 (11th Cir. Jul. 21, 2010)
17  (upholding dismissal of RLUIPA claim and granting qualified immunity on free exercise claim based on
    denial of alcohol-free lacto-vegetarian diet prepared with and served by non-disposable utensils not
18  having contact with meat or alcohol); *Kind v. Frank*, 329 F.3d 979, 981 (8th Cir. 2003) (jail officials
    entitled to qualified immunity where policy of providing Muslim inmate with pork-free, rather than
19  vegetarian, diet was objectively reasonable); *Kahey v. Jones*, 836 F.2d 948, 949-50 (5th Cir. 1988)
    (noting that "prisons need not respond to particularized religious dietary requests" and upholding
20  dismissal of free exercise claim by Muslim inmate whose beliefs prevented her from eating any food
    cooked or served in or on utensils which had come into contact with pork or any pork by-product); *Jihad
21  v. Fabian*, No. C09-1604 (SRN/LIB), 2011 U.S. Dist. LEXIS 46930 at *47-50 (D. Minn. Feb. 17, 2011)
    (no clearly established right to prepackaged halal meals); *Hudson v. Maloney*, 326 F. Supp. 2d 206,
22  211-14 (D. Mass. 2004) ("[N]o reasonable prison official would have concluded that Muslim inmates
    had an established right to Halal meals prepared by other Muslim inmates or that prison administrators
    did not have broad discretion in the matter of prison dietary alternatives.").

REPORT AND RECOMMENDATION
PAGE -45

01  182, 187-89 (4th Cir. 2009); *Sossamon v. Texas*, 560 F.3d 316, 327-29 (5th Cir. 2009); *Nelson*

02  *v. Miller*, 570 F.3d 868, 886-89 (7th Cir. 2009); *Smith v. Allen*, 502 F.3d 1255, 1271-75 (11th

03  Cir. 2007), *abrogated on other grounds by Sossamon*, ___ U.S. ___, 131 S. Ct. 1651 (2011);

04  *see also*, *e.g.*, *Mahone v. Pierce County*, C10-5847 RBL/KLS, 2011 U.S. Dist. LEXIS 62617 at

05  *11-17 (W.D. Wash. May 23, 2011), *adopted by* 2011 U.S. Dist. LEXIS 83980 (Aug. 1, 2011);

06  *Florer v. Bales-Johnson*, 752 F. Supp. 2d 1185, 1205-06 (W.D. Wash. 2010), *aff'd on other*

07  *grounds*, No. 11-35004, 2012 U.S. App. LEXIS 10298 (9th Cir. May 22, 2012).   These courts

08  reason that, because individual officers are not the recipients of federal funds, Congressional

09  enactments pursuant to the Spending Clause do not impose liability on individual defendants.

10  *See id*.   Courts have further found "there is no evidence of an effect on interstate or

11  international commerce by an alleged denial of a nutritionally or religiously adequate diet to

12  indicate that RLUIPA should be interpreted under the Commerce Clause."    *Bales-Johnson*,

13  752 F. Supp. 2d at 1206.

14       The Court finds no reason to depart from the circuit courts identified above and

15  numerous district courts within the Ninth Circuit.   Accordingly, the Court also recommends a

16  finding that plaintiff is not entitled to damages under RLUIPA against defendants in their

17  personal capacities.

18                                     CONCLUSION

19       For the reasons described above, the Court recommends defendants' motion (Dkt. 90)

20  be GRANTED in part and DENIED in part, and plaintiff's cross-motion (Dkt. 141) be

21  DENIED.  Plaintiff's RLUIPA, First Amendment, and unconstitutional punishment claims

22  related to an Arabic Qur'an and meals, dates, and a feast during his 2011 Ramadan should be

01   dismissed, as should his claim that the denial of Halal meat amounted to unconstitutional

02   punishment.   The parties should be denied summary judgment in relation to plaintiff's

03   RLUIPA and First Amendment claims challenging the denial of Halal meat, and as to his

04   unconstitutional punishment claims regarding drink supplements/the nutritional adequacy of

05   the Ramadan diet and the denial of pain reliever during Ramadan.   All of plaintiff's claims

06   against Terry should be dismissed, as should plaintiff's religious practice claims against

07   Raymond, DePaul, Bitner, George, and Smith.   Further, the individual defendants are entitled

08   to qualified immunity in relation to plaintiff's Halal meat claim, and should not be held liable

09   for damages in their personal capacities under RLUIPA.   A proposed order accompanies this

10   Report and Recommendation.

11          DATED this <u>19th</u> day of August, 2013.

12

13

14                                          Mary Alice Theiler
                                            Chief United States Magistrate Judge

15

16

17

18

19

20

21

22

REPORT AND RECOMMENDATION
PAGE -47